| | |
|---|---|
| NANCY A. MORENO and MONTI MORENO, | Case No. 18-CV-2760 (PJS/DTS) |
| Plaintiffs, | |
| v. | ORDER |
| WELLS FARGO BANK, N.A., | |
| Defendant. | |

Brian J. Wisdorf; Robert B. Bauer and William M. Topka, DOUGHERTY, MOLENDA, SOLFEST, HILLS & BAUER P.A., for plaintiffs.

Charles F. Webber and Jessica Z. Savran, FAEGRE BAKER DANIELS LLP, for defendant.

Plaintiffs Nancy and Monti Moreno ("the Morenos") borrowed money to purchase real property. The loan was secured with a mortgage on the property. The Morenos failed to repay the loan, and defendant Wells Fargo initiated foreclosure proceedings. Before the foreclosure sale took place, however, the property was damaged by a hail storm and a fire. The homeowners insurer paid $190,515.90 for the damage, and Wells Fargo placed those funds in an escrow account until the repairs were completed. The repairs were never completed.

Wells Fargo purchased the property at the foreclosure sale. The purchase price fell well short of the amount of money owed by the Morenos, as the value of the property had been significantly reduced by the (unrepaired) hail and fire damage. The

Morenos redeemed the property from Wells Fargo.  A dispute then arose over whether

the Morenos or Wells Fargo was entitled to the $190,515.90 in escrowed insurance

proceeds.  The Morenos brought this action to settle that dispute.

The relationship between the Morenos and Wells Fargo is contractual, and thus

their dispute must be resolved by interpreting their contract.  Instead of filing a

straightforward breach-of-contract action, however, the Morenos have gone the kitchen-

sink route, bringing not only a breach-of-contract claim, but also add-on claims for

violation of the Minnesota Consumer Fraud Act, conversion, civil theft, and unjust

enrichment.

Wells Fargo now moves to dismiss these add-on claims under Fed. R. Civ. P.

12(b)(6).  For the reasons that follow, the Court grants Wells Fargo's motion.

## I. BACKGROUND

In 2004, the Morenos borrowed $333,700 from Central Bank to purchase a lot

with a house and a barn in Marine on St. Croix, Minnesota.  ECF No. 12-1 at 1; ECF

No. 1-1 at ¶ 5.  The Morenos secured the loan with a mortgage on the property.  ECF

No. 1-1 at ¶ 6.  Central Bank subsequently assigned the mortgage to Wells Fargo.  *Id.*

Section 5 of the mortgage required the Morenos to maintain insurance on the

property to protect "against loss by fire . . . and any other hazards, including, but not

limited to, earthquakes and floods . . . ."  ECF No. 12-1 at p. 5, § 5, ¶ 1.  Section 5 also

provided that if the property was damaged, Wells Fargo had the right to hold onto any insurance proceeds until Wells Fargo could inspect the property and ensure that the damage had been satisfactorily repaired. *Id.* at p. 5, § 5, ¶ 4. Section 5 further provided that Wells Fargo could keep the insurance proceeds if it "acquire[d] the Property under Section 22 [of the mortgage] or otherwise." *Id.* at p. 6, § 5, ¶ 5.

Section 22 essentially gave Wells Fargo the right to foreclose on the property if the Morenos defaulted under the promissory note and failed to cure. *Id.* at p. 11, § 22. If Wells Fargo received the right to keep the insurance proceeds by virtue of having acquired the property under Section 22, then, under Section 5, Wells Fargo could "use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due." *Id.* at p. 6, § 5, ¶ 5.

Two unrelated events caused damage to the Morenos' property and triggered payments from the Morenos' homeowners insurer. First, on May 25, 2008, hail damaged the roof of the house. ECF No. 1-1 at ¶ 16. On July 8, 2008, the Morenos' insurer paid out $14,515.90, which Wells Fargo held in escrow until the Morenos repaired the roof. *Id.* at ¶¶ 18-19. Years passed, but the Morenos did not repair the roof, so the insurance proceeds sat in the escrow account. Then, on January 28, 2015, a

fire destroyed the barn.  *Id.* at ¶ 20.  On April 8, 2016, the Morenos' insurer paid out

$176,000, which Wells Fargo also held in escrow.  *Id.* at ¶¶ 22-23.

In 2007—prior to either the 2008 hail storm or the 2015 fire—Wells Fargo

commenced foreclosure proceedings on the Morenos' property after the Morenos failed

to make the promised repayments on their loan.  ECF No. 1-1 at ¶ 10.  For some reason,

Wells Fargo did not obtain a judgment of foreclosure until August 2015.  ECF No. 12-1

at 20.  It appears that at least part of the long delay may have been caused by the fact

that the Morenos retained attorney William B. Butler to represent them.  ECF No. 12-1 at

13.  Until he was indefinitely suspended from practicing law, *see In re Disciplinary Action

Against Butler*, 868 N.W.2d 243 (Minn. 2015), Butler made "a cottage industry" out of

filing frivolous lawsuits on behalf of homeowners who had defaulted on their loans,

*Welk v. GMAC Mortg., LLC*, 850 F. Supp. 2d 976, 981 (D. Minn. 2012).  Clients would pay

Butler "not for bringing legitimate claims, but simply for each month that he delay[ed]

foreclosure by tying up mortgagees in frivolous court proceedings."  *Id.* at 1004.

The Minnesota court that entered the judgment of foreclosure against the

Morenos found that, as of July 10, 2015, the Morenos owed Wells Fargo $521,842.75 in

unpaid principal, interest, costs, and fees.  ECF No. 12-1 at p. 14, ¶ 7.  On November 10,

2015, Wells Fargo purchased the property at the sheriff's sale for $187,910.  ECF No. 1-1

at ¶¶ 11-12.  The amount that Wells Fargo paid for the property at the sheriff's sale was

-4-

significantly less than the amount that the Morenos had paid for the property when they purchased it in 2004, no doubt reflecting the fact that the barn had been destroyed by fire and the roof of the house had been damaged by hail. In December 2016, the Morenos came up with $208,263.62 to redeem the property from Wells Fargo. ECF No. 1-1 at ¶ 14.

At this point, the Morenos had suffered no financial loss as a result of their breach of the promissory note, the protracted legal proceedings, the hail storm, and the fire. They owned a piece of property worth roughly $200,000 for which they had paid roughly $200,000, their considerable remaining debt to Wells Fargo was erased by the fact that Wells Fargo did not seek a deficiency judgment against them, and they had (presumably) enjoyed years of rent-free living in their house. At the same time, Wells Fargo had taken a financial bath, as the amount that Wells Fargo recovered from the Morenos was over $300,000 less than the Morenos owed.

Not satisfied with their good fortune, the Morenos then insisted that Wells Fargo also pay them the $190,515.90 in insurance proceeds that had been escrowed, even though it had been Wells Fargo, and not the Morenos, that ultimately suffered financial loss on account of the hail storm and fire. ECF No. 1-1 at ¶¶ 18, 22, 25. Wells Fargo refused, contending that Section 5 of the mortgage gave it the right to retain the insurance proceeds because it had "acquire[d] the Property" under Section 22 of the

mortgage. ECF No. 11 at 6-7, 9-12. The Morenos disagreed, contending that, because

they redeemed the property after the sheriff's sale, Wells Fargo never "acquired" the

property, and thus Wells Fargo had no right to the insurance proceeds. ECF No. 17 at 6-

8.

The Morenos filed this lawsuit to recover the insurance proceeds, arguing that

Wells Fargo's failure to release the insurance proceeds to them was not only a breach of

the mortgage contract, but also (1) a violation of the Minnesota Consumer Fraud Act,

(2) conversion, (3) civil theft, and (4) unjust enrichment. ECF No. 1-1. Wells Fargo

moves to dismiss all claims—save the claim for breach of contract—under Fed. R. Civ.

P. 12(b)(6). ECF No. 8.

## II. ANALYSIS

In ruling on a motion to dismiss, a court must treat the facts pleaded in the

complaint as true and construe those facts in the light most favorable to the plaintiff.

*See DeVries v. Driesen*, 766 F.3d 922, 923 (8th Cir. 2014).[1] "To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

---

[1]A court may also consider public records and documents embraced by the pleadings without converting a motion to dismiss into a summary-judgment motion. *See Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012). In this case, the Court has considered the mortgage contract between the Morenos and Central Bank/Wells Fargo and the 2015 mortgage-foreclosure judgment. No party has objected to the Court's consideration of these materials or questioned their authenticity.

claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### A.  Minnesota Consumer Fraud Act Claim

The Minnesota Consumer Fraud Act ("MCFA") prohibits "[t]he act, use, or

employment by any person of any fraud, false pretense, false promise,

misrepresentation, misleading statement or deceptive practice, with the intent that

others rely thereon in connection with the sale of any merchandise . . . ."  Minn. Stat.

§ 325F.69, subd. 1.  The Minnesota Attorney General has primary responsibility for

enforcing the MCFA, *see* Minn. Stat. § 8.31, subd. 1, but private citizens may—in some

instances—file lawsuits to recover damages for violations of the MCFA under the

"private attorney general statute," Minn. Stat. § 8.31, subd. 3a.  To recover under the

private attorney general statute, however, a plaintiff must demonstrate that her action

"benefits the public."  *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000).  In determining

whether an action benefits the public, a court must consider (among other things) the

nature of the alleged fraud or misrepresentation.  If the alleged fraud or

misrepresentation arose in the course of a "single one-on-one transaction," then the

lawsuit will not likely benefit the public, but only the plaintiff.  *Id.*

In this case, the Morenos allege that Wells Fargo committed fraud because, at the

time that it entered into the mortgage contract, it never intended to comply with the

provision of the contract that required Wells Fargo to use insurance proceeds to either repair the property or to cover unpaid amounts under the note. ECF No. 1-1 at ¶¶ 40-41. The Morenos' claim borders on frivolous for several reasons:

First, the Morenos did not enter into a mortgage contract with Wells Fargo. They entered into a mortgage contract with Central Bank, which then assigned the mortgage to Wells Fargo. ECF No. 1-1 at ¶ 6; ECF No. 12-1 at p. 14, ¶¶ 3, 6. It is difficult to know how Wells Fargo could have entered into a contract without intending to comply with one of its terms when Wells Fargo did not enter into that contract *at all*. (The Morenos have not alleged that, at the time that *Central Bank* entered into the mortgage contract, *Central Bank* did not intend to comply with one of its provisions.)

Second, even if it had been Wells Fargo that had entered into the mortgage with the Morenos, the Morenos have not plausibly alleged that at the time that the mortgage was executed in 2004, Wells Fargo did not intend to honor the provision. As a general matter, a statement is not fraudulent unless it is "a false representation . . . of a past or existing material fact susceptible of knowledge." *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368 (Minn. 2009). The Morenos allege no such false representation in this case. Instead, they allege that, in the mortgage contract, Wells Fargo promised that it would use insurance proceeds only in particular ways, when it did not intend to honor that promise. Although "'[i]t is true that a misrepresentation of a present

intention could amount to fraud,'" the Minnesota Supreme Court has cautioned that "'it must be made affirmatively to appear that the promisor had no intention to perform at the time the promise was made.'" *Id.* at 368-69 (quoting *Vandeputte v. Soderholm*, 216 N.W.2d 144, 147 (Minn. 1974)).

The Morenos have pleaded no facts that make plausible the facially absurd proposition that, when Central Bank/Wells Fargo entered into the mortgage contract with the Morenos, it did not intend to comply with an obscure provision that addressed the unusual situation in which the mortgagee would obtain a property through foreclosure at the time that the mortgagee was escrowing funds paid by an insurer because the property had been damaged but not yet repaired. In support of their allegation, the Morenos have pleaded only the fact that, 12 years after the mortgage was signed, Wells Fargo interpreted this provision differently than the Morenos did. Even assuming that Wells Fargo's interpretation was incorrect and thus that it breached the mortgage, the fact that a party to a contract breaches it years after the contract was signed does not, in and of itself, make plausible the allegation that the party did not intend to honor the contract at the time it was signed. If it did, then the *Morenos* could be sued for fraud, as they signed a promissory note in which they promised to repay the money they borrowed, and, within a couple of years, they had already breached their promise.

Third, Wells Fargo's interpretation is not incorrect.  As noted, Section 5 requires Wells Fargo to "use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due."  ECF No. 12-1 at p. 6, § 5, ¶ 5.  Wells Fargo cannot use the proceeds to "repair or restore the Property," as Wells Fargo no longer has any legal rights with respect to the property.  But Wells Fargo can use the proceeds to "pay amounts unpaid under the Note."

Plaintiffs argue that they do not have a legal obligation to pay anything more to Wells Fargo—as Wells Fargo did not obtain a deficiency judgment against them—and thus there is no longer any "amounts unpaid under the Note."  In other words, plaintiffs argue that an amount is not "unpaid under the Note" unless the mortgagor has a current legal obligation to pay that amount to the mortgagee.  But plaintiffs' interpretation is clearly refuted by Section 5, which authorizes Wells Fargo to use the insurance proceeds to "pay amounts unpaid under the Note or this Security Instrument, *whether or not then due*."  ECF No. 12-1 at p. 6, § 5, ¶ 5 (emphasis added).  Clearly, then, Wells Fargo can apply the insurance proceeds to any amount that is unpaid under the note, whether or not that amount is "due"—i.e., whether or not the mortgagor is legally required to pay that amount to Wells Fargo.  The Morenos left more than $300,000

unpaid under the promissory note, and Wells Fargo can apply the insurance proceeds to that amount.

Finally, the Morenos' lawsuit arises out of a "single one-on-one transaction"—the mortgage contract between the Morenos and Central Bank—and the Morenos are seeking only to recover damages for themselves. *Ly*, 615 N.W.2d at 314. Because the Morenos' claim has not been brought to "benefit[] the public," the claim cannot be pursued under the private attorney general statute. *Id.* ("Appellant was defrauded in a single one-on-one transaction in which the fraudulent misrepresentation, while evincing reprehensible conduct, was made only to appellant. A successful prosecution of his fraud claim does not advance state interests and enforcement has no public benefit, and is not a claim that could be considered to be within the duties and responsibilities of the attorney general to investigate and enjoin.").

The Morenos argue that, because the mortgage they executed was a form contract, and because they are seeking a judicial interpretation of one of its provisions, their lawsuit will benefit "tens-of-thousands" of others who have signed or will consider signing the same form contract. ECF No. 17 at 3. Putting aside the fact that none of this was pleaded in the Morenos' complaint—which "is devoid of any allegations that the complaint was brought for the 'public benefit' or how their action

benefits the public," *Baker v. Best Buy Stores, LP*, 812 N.W.2d 177, 183 (Minn. Ct. App. 2012)—the Morenos' argument is meritless.

The Morenos allege that their contract is a form contract, but they do not allege that any provision of that form contract is *itself* misleading. In other words, this is nothing like the situation where, say, a plaintiff alleges that she was defrauded by a misleading advertisement that was also viewed by thousands of others. *Cf. Collins v. Minn. Sch. of Bus., Inc.*, 655 N.W.2d 320, 330 (Minn. 2003) (claim under the MCFA held to benefit the public because the defendant "made misrepresentations to the public at large" in a "television advertisement" and in "numerous sales and information presentations"). There is absolutely nothing fraudulent or deceptive about the insurance-proceeds provision in the mortgage contract.

Thus, the only "public benefit" that the Morenos can conjure up is that the Court will resolve a run-of-the-mill contract dispute by interpreting an allegedly ambiguous provision in a form contract, and thus those who are parties to contracts containing this provision—and those who in the future may enter contracts including this provision—will know what it means. ECF No. 17 at 3-5. But this has nothing to do with the MCFA, which makes it unlawful to engage in acts of *fraud*, not to enter into contracts with ambiguous provisions. And this has nothing to do with the private

attorney general statute, which authorizes lawsuits that will benefit the public by protecting them from *fraud*.

Again, the "fraud" alleged by the Morenos is that Wells Fargo (actually, Central Bank) sat down at the closing on January 27, 2004, and entered into a mortgage agreement with them while not intending to honor the last sentence of the fifth paragraph of the fifth section of the 12-page, single-spaced mortgage. This is an allegation that Wells Fargo committed fraud in the course of a single one-on-one transaction, and the only relief sought by the Morenos for this alleged fraud is damages—i.e., that money be put into their pockets.[2] The Morenos' claim does not seek to benefit the public, and thus it falls outside the scope of the private attorney general statute. *Ly*, 615 N.W.2d at 314; *see also Davis v. U.S. Bancorp*, 383 F.3d 761, 768 (8th Cir. 2004) ("The class of plaintiffs under the private attorney general statute would be limitless if we assumed that one individual's negative experience with a company was necessarily duplicated for every other individual and on that basis treated personal claims as benefitting the public.").

---

[2]"Although there exists no hard-and-fast rule, a public benefit typically will be found when the plaintiff seeks relief primarily aimed at altering the defendant's conduct (usually, but not always, through an injunction) rather than seeking remedies for past wrongs (typically through damages)." *Buetow v. A.L.S. Enters., Inc.*, 888 F. Supp. 2d 956, 961 (D. Minn. 2012).

*B. Conversion and Civil Theft Claims*

The Morenos allege that Wells Fargo committed both conversion and civil theft when it refused to distribute the insurance proceeds to them. Conversion and civil theft require exercising dominion and control over, or wrongfully taking, *another's* property.[3] Wells Fargo moves to dismiss these claims, arguing that the Morenos cannot show that Wells Fargo exercised dominion and control over, or wrongfully took, the Morenos' property, because under the mortgage agreement, it was Wells Fargo, and not the Morenos, who had the right to the insurance proceeds.

Section 5 of the mortgage provides that if Wells Fargo "acquires the Property under Section 22 [of the mortgage] or otherwise," Wells Fargo has the right to keep the insurance proceeds. ECF No. 12-1 at p. 6, § 5, ¶ 5. Wells Fargo may then use the proceeds "either to repair or restore the Property or to pay amounts unpaid under the

---

[3]Specifically, to be liable for conversion, one must "exercise . . . dominion and control over goods inconsistent with, and in repudiation of, the owner's rights in those goods." *Rudnitski v. Seely*, 452 N.W.2d 664, 668 (Minn. 1990) (citing *Hildegarde, Inc. v. Wright*, 70 N.W.2d 257, 259 (Minn. 1955)); Minn. Stat. § 336.3-420(a) ("The law applicable to conversion of personal property applies to instruments.").

To be liable for civil theft, an individual must "steal[] personal property from another . . . ." Minn. Stat. § 604.14, subd. 1. Minnesota courts have interpreted "steal" to mean "that a person wrongfully and surreptitiously takes another person's property for the purpose of keeping it or using it." *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs.*, 896 N.W.2d 115, 126 (Minn. Ct. App. 2017) (quoting *TCI Bus. Capital, Inc. v. Five Star Am. Die Casting, LLC*, 890 N.W.2d 423, 431 (Minn. Ct. App. 2017)).

Note or this Security Instrument, whether or not then due." *Id.* The parties disagree about the meaning of phrase "acquires the Property under Section 22 or otherwise."

The Morenos argue that Wells Fargo cannot "acquire[] the Property under Section 22 or otherwise" unless it acquires the property for purposes of Minnesota law. The Morenos further contend that because they redeemed the property from Wells Fargo after Wells Fargo bought it at a foreclosure sale, Wells Fargo never acquired the property for purposes of Minnesota law because a redemption annuls a foreclosure sale. ECF No. 17 at 6-8.

Wells Fargo does not dispute that it did not acquire the property for purposes of Minnesota law. Instead, Wells Fargo argues that the disputed phrase—"acquires the Property under Section 22 or otherwise"—is broad enough to reach not just acquiring the property for purposes of Minnesota law, but also acquiring the property by purchasing it at a sheriff's sale. This is, of course, a question of contract interpretation.

Minnesota follows the "rule of contract interpretation that requires [courts] to give effect to all of a contract's terms." *Metro. Airports Comm'n v. Noble*, 763 N.W.2d 639, 645 (Minn. 2009) (citing *Current Tech. Concepts, Inc. v. Irie Enters., Inc.*, 530 N.W.2d 539, 543 (Minn. 1995)). A court must "attempt to avoid an interpretation of the contract that would render a provision meaningless." *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d

522, 526 (Minn. 1990) (citing *Ind. Sch. Dist. No. 877 v. Loberg Plumbing & Heating*, 123

N.W.2d 793, 799-800 (Minn. 1963)).

The problem with the Morenos' interpretation of the disputed provision is

that—as the Morenos' attorney conceded at oral argument—their interpretation renders

meaningless the phrase "under Section 22 or otherwise." If the phrase "acquires the

Property under Section 22 or otherwise" was intended to reach only transactions that

qualified as acquisitions under state law, then the phrase could have stopped with

"acquires the Property." Adding the words "under Section 22 or otherwise" serves no

purpose—unless the provision is intended to capture a type of "acquisition" that does

*not* qualify as an acquisition under state law.

The type of non-legally-recognized acquisition that the contract has in mind is

made clear by the reference to "Section 22." Section 22 gives Wells Fargo the power of

sale—i.e., the right to sell the property in a foreclosure proceeding—if the mortgagor

defaults on the promissory note and fails to cure. It is difficult to identify any purpose

for the provision's use of the words "under Section 22 or otherwise" unless the

provision was meant to capture precisely the type of acquisition at issue here: The

purchase of a property at a foreclosure sale.

A second problem with the Morenos' interpretation of the disputed provision is

that no rational bank would have agreed to such a provision if it meant what the

Morenos say it means. One of the situations addressed by the disputed provision is the following: A borrower goes into default under her promissory note. The bank commences foreclosure proceedings. While the foreclosure proceedings are pending, the mortgaged property is damaged, and a claim is filed with the homeowners insurer. A sheriff's sale is scheduled.

If the disputed provision is interpreted as Wells Fargo urges, then the bank can bid the (reduced) market value of the damaged property and use the insurance proceeds to help cover its losses under the mortgage. If the disputed provision is interpreted as the Morenos allege, then the bank will be faced with the choice of (1) grossly overpaying for the damaged property at the foreclosure sale (and then having to hope that the insurer will pay the claim and that the amount paid will cover the amount of the overpayment) or (2) bidding the reduced market value, having the mortgagor redeem the property at the reduced market value, *and* watching the mortgagor pocket any insurance proceeds. Why would any bank agree to such a lopsided provision—one that provides nothing but financial risk for the bank and nothing but financial windfall for the mortgagor?

For these reasons, the Court agrees with Wells Fargo that it "acquired" the Morenos' property for purposes of Section 5 of the mortgage when it purchased that property at the sheriff's sale on November 10, 2015. Wells Fargo was therefore entitled

to retain the $190,515.90 in escrowed insurance proceeds and apply those proceeds to offset the $300,000-plus that remained unpaid under the Morenos' promissory note. Because the insurance proceedings belong to Wells Fargo, the Morenos' claims for conversion and civil theft are dismissed.

## C. Unjust-Enrichment Claim

Finally, the Morenos bring an unjust-enrichment claim against Wells Fargo. This claim is entirely duplicative of the breach-of-contract claim. The only reason given by the Morenos for why Wells Fargo's retention of the insurance proceeds is "unjust" is that the Morenos are entitled to those proceeds under the mortgage contract. But if the Morenos are entitled to those proceeds under the mortgage contract, they will recover those proceeds on their breach-of-contract claim. And if the Morenos are not entitled to those proceeds under the mortgage contract, there is nothing unjust about Wells Fargo retaining them. The unjust-enrichment claim has no purpose, other than to create needless work for the Court and the parties.

The Morenos protest that, under the Federal Rules of Civil Procedure, they are permitted to plead claims in the alternative. That is certainly true. What the Morenos ignore, however, is that under those same Federal Rules of Civil Procedure, each of the alternative claims must be plausible. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.

A plaintiff cannot recover for unjust enrichment "when there is an enforceable contract that is applicable." *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012). Thus, in order to plead a plausible claim for unjust enrichment, the Morenos must plead that their contract with Wells Fargo is not enforceable for some reason—and, in support of that allegation, the Morenos must plead "enough facts" to make their allegation "plausible on its face." *Twombly*, 550 U.S. at 570. The Morenos have not alleged (plausibly or otherwise) that their contract with Wells Fargo is not enforceable, and thus they have not alleged a plausible unjust-enrichment claim. *See Baumgardner v. Bimbo Food Bakeries Distrib.*, 697 F. Supp. 2d 801, 816 (N.D. Ohio 2010) ("While alternative pleading of unjust enrichment and breach of contract can be permissible, it is inappropriate in situations . . . where the complaint sets forth no plausible basis to invoke unjust enrichment because there is no dispute that the [contract] is valid and that the conduct complained of is explicitly covered by that express contract." (quotation marks and citations omitted)).

Finally, even if the Morenos had plausibly pleaded that their contract with Wells Fargo was unenforceable, the Court would nevertheless dismiss their unjust-enrichment claim. "To establish an unjust enrichment claim, the claimant must show that the defendant has knowingly received or obtained something of value for which the defendant 'in equity and good conscience' should pay." *ServiceMaster of St. Cloud v.*

*GAB Business Servs.*, 544 N.W.2d 302, 306 (Minn. 1996) (quoting *Klass v. Twin City Fed. Sav. & Loan Ass'n*, 190 N.W.2d 493, 494-95 (Minn. 1971)).  There is nothing remotely "unjust" or "inequitable" about Wells Fargo retaining the insurance proceeds.  To the contrary, it is the Morenos who are trying to use this lawsuit to inflict an injustice.

Consider the following hypothetical:  The Morenos borrow $550,000 from Wells Fargo to buy a piece of land worth $50,000 and a house worth $500,000.  The Morenos secure the loan with a mortgage—that is, a promise to Wells Fargo that, if they do not repay their loan as promised, Wells Fargo can sell the land and house and apply the proceeds to the unpaid balance.  Within a few months, the Morenos go into default, and Wells Fargo commences foreclosure proceedings.  While the proceedings are pending, a fire destroys the house, leaving land worth $50,000.  Wells Fargo purchases the land for $50,000 at the foreclosure sale, the Morenos redeem, and Wells Fargo does not pursue a deficiency judgment.

At this point, the Morenos own a $50,000 piece of land that they purchased for $50,000.  They have suffered no financial loss whatsoever.  Wells Fargo, by contrast, has lost over $500,000 because the Morenos did not honor their promise to repay their loan.  When the homeowners insurer later issues a check in the amount of $500,000 to cover the loss of the home, why would it be unjust for Wells Fargo to keep those proceeds?  After all, that $500,000 represents the *house*, and the Morenos pledged that *house* to

secure their loan.  And why would it be just for the Morenos to receive a $500,000

windfall because they breached their promise to repay their loan?

This hypothetical presents a situation that is materially indistinguishable from

the facts of this case.  Wells Fargo has not received anything "of value for which [it] 'in

equity and good conscience' should pay."  *Id.* (quoting *Klass*, 190 N.W.2d at 494-95).

Thus, the Morenos' unjust-enrichment claim would fail even if their contract with Wells

Fargo was found unenforceable, and for that reason the Court dismisses the claim with

prejudice.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.    Defendant's motion to dismiss [ECF No. 8] is GRANTED.

2.    Counts II, III, IV, and V of the complaint are DISMISSED WITH

PREJUDICE AND ON THE MERITS.

Dated: April 1, 2019                              _s/Patrick J. Schiltz_____
                                                  Patrick J. Schiltz
                                                  United States District Judge